IN THE UNITED STATES DISTRICT COURT
DISTRICT COURT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| LAKEWOOD TOWNSHIP<br>MUNICIPAL UTILITIES<br>AUTHORITY, | ) <br> ) <br> ) <br> ) | |
| Plaintiff, | ) <br> ) | |
| v. | ) <br> ) | **Master Docket No. 2:18-mn-2873** |
| 3M COMPANY (f/k/a Minnesota Mining<br>and Manufacturing Company); | ) <br> ) | **JUDGE RICHARD GERGEL** |
| AGC CHEMICALS AMERICAS INC.; | ) | **Civil Action No.:** 2:23-cv-00233-RMG |
| AMEREX CORPORATION; | ) | |
| ARCHROMA U.S., INC.; | ) | |
| ARKEMA, INC.; | ) | |
| BUCK EYE FIRE EQUIPMENT | ) | **COMPLAINT AND JURY DEMAND** |
| COMPANY; | ) | |
| CARRIER GLOBAL CORPORATION; | ) | |
| CHEMDESIGN PRODUCTS, INC.; | ) | |
| CHEMGUARD, INC.; | ) | |
| CHEMICALS, INC.; | ) | |
| CHEMOURS COMPANY FC, LLC; | ) | |
| CHUBB FIRE, LTD; | ) | |
| CLARIANT CORP.; | ) | |
| CORTEVA, INC. | ) | |
| DEEPWATER CHEMICALS INC.; | ) | |
| DU PONT DE NEMOURS INC. | ) | |
| (f/k/a DOWDUPONT INC.;) | ) | |
| DYNAX CORPORATION; | ) | |
| E.I. DU PONT DE NEMOURS AND | ) | |
| COMPANY; | ) | |
| KIDDIE-FENWAL, INC.; | ) | |
| KIDDIE PLC; | ) | |
| NATION FORD CHEMICAL | ) | |
| COMPANY; | ) | |
| NATIONAL FOAM, INC.; | ) | |
| THE CHEMOURS COMPANY; | ) | |
| TYCO FIRE PRODUCTS LP, as | ) | |
| Successor-in-interest to the Ansul | ) | |
| Company; UNITED TECHNOLOGIES | ) | |
| CORPORATION; | ) | |
| UTC FIRE & SECURITY AMERICAS | ) | |

CORPORATION, INC. (f/k/a GE        )
Interlogix, Inc.); and ABC          )
CORPORATIONS (1-50),                )
                                    )
       Defendants.        )

Plaintiff, the Lakewood Township Municipal Utilities Authority, by and through its

attorneys, Wilentz Goldman & Spitzer, P.A., by way of Complaint against the Defendants

alleges as follows:

## INTRODUCTION

1.      Plaintiff, the Lakewood Township Municipal Utilities Authority, owns and

operates a public drinking water system and supplies drinking water to thousands of residents and

businesses that depend on the Lakewood Township Municipal Utilities Authority, for their water

needs. Plaintiff seeks to recover by this action the substantial costs necessary to protect the public

and restore certain of its water supply wells and/or sources, which are contaminated by the toxic

chemicals per- and polyfluoroalkyl substances ("PFAS"), which include perfluorooctane sulfonate

("PFOS") and perfluorooctanoic acid ("PFOA").

2.      PFOA and PFOS are persistent, toxic, and bioaccumulative compounds when

released into the environment.

3.      PFOA and PFOS have impacted aquifers, storm water, surface water and

groundwater, and now contaminate the water pumped from the Plaintiff's water supply wells

and/or other water sources from aquifers, groundwater and/or surface water.

4.      Plaintiff brings this action to address the widespread contamination with PFAS of

its water sources that provide drinking water, to recover the costs and expenses associated with the

contamination of its water sources and drinking water, and further seek abatement of the ongoing

nuisance these chemicals constitute in the environment, and for such other action as is necessary

to ensure that the PFAS that contaminate the Plaintiff's water sources do not present a risk to the public.

5.      Defendants are companies that designed, manufactured, marketed, distributed, and/or sold PFOA and PFOS, the chemical precursors of PFOA and PFOS, and/or products containing PFOA and PFOS, and/or their chemical precursors. Defendants made products with PFAS including but are not limited to, Teflon®, Scotchguard®, waterproofing compounds, stain-proofing compounds, waxes, cloth coatings, paper and food package coatings like Zonyl®, aqueous film-forming foam ("AFFF"), a firefighting agent used to control and extinguish Class B fuel fires, and fluorosurfactants used in the manufacture of AFFF as well as telomer building blocks used to make fluorosurfactants that were then used to manufacture other PFAS-containing products, including AFFF.

6.      The Defendants' previously-described products are believed to include PFOS, PFOA, and/or certain other perfluorinated compounds ("PFCs") that degrade into PFOS or PFOA. (Toxic PFAS that included PFOS, PFOA and the PFCs that degrade into PFOS or PFOA are hereinafter referred to as "Toxic Surfactants.")

7.      Further, among other things, the Defendants knowingly and willfully manufactured, promoted, and sold PFOS- and PFOA-based products, including, but may not be limited to, AFFF and fluorosurfactant additives, when they knew or reasonably should have known that these harmful compounds would reach aquifers, groundwater and surface water, pollute drinking water supplies, render drinking water unusable and/or unsafe, and threaten public health and welfare, as they have done with respect to Plaintiff's water supply.

8.      Plaintiff brings this lawsuit to recover compensatory, punitive and all other available damages, including all necessary funds to compensate Plaintiff for the costs of

investigating, designing, constructing, installing, operating and maintaining the treatment facilities and equipment to remove PFAS, including PFOS and PFOA, from its water supply, for any all costs incurred by Plaintiff complying with the any and all government and regulatory guidelines for PFAS, including PFOS and PFOA, the contamination of Plaintiff's water sources and drinking water, and to ensure that the responsible parties bear such expense, rather than Plaintiff or its taxpayers and ratepayers.

## PARTIES

9.      Plaintiff, the Lakewood Township Municipal Utilities Authority, is a public utility with its offices located at 390 New Hampshire Avenue, Lakewood, New Jersey 08701.

10.      Defendant, 3M Company, f/k/a Minnesota Mining and Manufacturing Company, ("3M"), is a Delaware corporation and does business throughout the United States. 3M has its principal place of business at 3M Center, St. Paul, Minnesota 55133.

11.      3M designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used AFFF containing PFAS that are used in firefighting training and response exercises which are the subject of this Complaint and/or other PFAS-containing products or additives. Further, defendant designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in firefighting and/or other PFAS-containing products or additives.

12.      Defendant AGC Chemicals Americas, Inc. ("AGC") is a Delaware corporation and does business throughout the United States. AGC has its principal place of business at 55 E. Uwchlan Ave., Suite 201, Exton, Pennsylvania 19341.

13.     AGC designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used AFFF containing PFAS that are used in firefighting training and response exercises which are the subject of this Complaint and/or other PFAS-containing products or additives. Further, defendant designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in firefighting and/or other PFAS-containing products or additives.

14.     Defendant Amerex Corporation ("Amerex") is an Alabama corporation and does business throughout the United States. Amerex has its principal place of business at 7595 Gadsden Highway, Trussville, Alabama 35173.

15.     Amerex designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used AFFF containing PFAS that are used in firefighting training and response exercises which are the subject of this Complaint and/or other PFAS-containing products or additives. Further, defendant designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in firefighting and/or other PFAS-containing products or additives.

16.     Defendant Archroma U.S. Inc. ("Archroma") is a North Carolina company and does business throughout the United States. Archroma has its principal place of business at 5435 77 Center Drive, #10 Charlotte, North Carolina 28217. Upon information and belief, Archroma

was formed in 2013 as part of the acquisition of Clariant Corporation's Textile Chemicals, Paper Specialties and Emulsions business by SK Capital Partners.

17.     Archroma designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used AFFF containing PFAS that are used in firefighting training and response exercises which are the subject of this Complaint and/or other PFAS-containing products or additives. Further, defendant designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in firefighting and/or other PFAS-containing products or additives.

18.     Defendant Arkema, Inc. ("Arkema") is a Pennsylvania corporation and does business throughout the United States. Arkema has its principal place of business at 900 1st Avenue, King of Prussia, Pennsylvania 19406. Upon information and belief, assets of Arkema's fluorochemical business were purchased by Defendant Dupont in 2002.

19.     Arkema designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used AFFF containing PFAS that are used in firefighting training and response exercises which are the subject of this Complaint and/or other PFAS-containing products or additives. Further, defendant designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in firefighting and/or other PFAS-containing products or additives.

20.    Defendant Buckeye Fire Equipment Company ("Buckeye") is an Ohio corporation and does business throughout the United States. Buckeye has its principal place of business at 110 Kings Road, Mountain, North Carolina 28086.

21.    Buckeye designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used AFFF containing PFAS that are used in firefighting training and response exercises which are the subject of this Complaint and/or other PFAS-containing products or additives. Further, defendant designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in firefighting and/or other PFAS-containing products or additives.

22.    Defendant Carrier Global Corporation ("Carrier") is a Delaware corporation and does business throughout the United States. Carrier has its principal place of business at 13995 Pasteur Boulevard, Palm Beach Gardens, Florida 33418. Upon information and belief, Carrier was formed in 2020 and is the parent company of Kidde-Fenwal, Inc., a manufacturer of AFFF.

23.    Carrier designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used AFFF containing PFAS that are used in firefighting training and response exercises which are the subject of this Complaint and/or other PFAS-containing products or additives. Further, defendant designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in firefighting and/or other PFAS-containing products or additives.

24.    Defendant ChemDesign Products, Inc. ("ChemDesign") is a Texas corporation and does business throughout the United States. ChemDesign has its principal place of business at 2 Stanton Street, Marinette, Wisconsin 54143.

25.    ChemDesign designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used AFFF containing PFAS that are used in firefighting training and response exercises which are the subject of this Complaint and/or other PFAS-containing products or additives. Further, defendant designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in firefighting and/or other PFAS-containing products or additives.

26.    Defendant Chemguard, Inc. ("Chemguard") is a Wisconsin corporation and does business throughout the United States. Chemguard has its principal place of business at One Stanton Street, Marinette, Wisconsin 54143.

27.    Chemguard designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used AFFF containing PFAS that are used in firefighting training and response exercises which are the subject of this Complaint and/or other PFAS-containing products or additives. Further, defendant designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in firefighting and/or other PFAS-containing products or additives.

28.     Defendant Chemicals, Inc. ("Chemicals") is a Texas corporation and does business throughout the United States. Chemicals has its principal place of business at 12321 Hatcherville Road, Baytown, Texas 77521.

29.     Chemicals designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used AFFF containing PFAS that are used in firefighting training and response exercises which are the subject of this Complaint and/or other PFAS-containing products or additives. Further, defendant designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in firefighting and/or other PFAS-containing products or additives.

30.     Defendant Chemours Company FC, LLC ("Chemours FC"), is a Delaware corporation and does business throughout the United States. Chemours has its principal place of business at 1007 Market Street, Wilmington, Delaware 19899. Chemours FC is a subsidiary of The Chemours Company.

31.     Chemours FC designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used AFFF containing PFAS that are used in firefighting training and response exercises which are the subject of this Complaint and/or other PFAS-containing products or additives. Further, defendant designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in firefighting and/or other PFAS-containing products or additives.

32.    Defendant Chubb Fire, Ltd. ("Chubb") is a foreign private limited company, with offices at Littleton Road, Ashford, Middlesex, United Kingdom TW15 1TZ. Upon information and belief, Chubb is registered in the United Kingdom with a registered number of 134210. Upon information and belief, Chubb is or has been composed of different subsidiaries and/or divisions, including but not limited to, Chubb Fire & Security Ltd., Chubb Security, PLC, Red Hawk Fire & Security, LLC, and/or Chubb National Foam, Inc.

33.    Chubb Fire designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used AFFF containing PFAS that are used in firefighting training and response exercises which are the subject of this Complaint and/or other PFAS-containing products or additives. Further, defendant designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in firefighting and/or other PFAS-containing products or additives.

34.    Defendant Clariant Corporation ("Clariant") is a New York corporation and does business throughout the United States. Clariant has its principal place of business at 4000 Monroe Road, Charlotte, North Carolina 28205.

35.    Clariant designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used AFFF containing PFAS that are used in firefighting training and response exercises which are the subject of this Complaint and/or other PFAS-containing products or additives. Further, defendant designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used underlying

chemicals and/or products added to AFFF which contained PFAS for use in firefighting and/or other PFAS-containing products or additives.

36.     Defendant Corteva, Inc. ("Corteva") is a Delaware Corporation that conducts business throughout the United States. Its principal place of business is Chestnut Run Plaza 735, Wilmington, Delaware 19805. Corteva is the successor-in-interest to Dupont Chemical Solutions Enterprise.

37.     Corteva designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used AFFF containing PFAS that are used in firefighting training and response exercises which are the subject of this Complaint and/or other PFAS-containing products or additives. Further, defendant designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in firefighting and/or other PFAS-containing products or additives.

38.     Defendant Deepwater Chemicals, Inc. ("Deepwater") is a Delaware corporation and does business throughout the United States. Deepwater's principal place of business is at 196122 E County Road 735, Woodward, Oklahoma 73801.

39.     Deepwater designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used AFFF containing PFAS that are used in firefighting training and response exercises which are the subject of this Complaint and/or other PFAS-containing products or additives. Further, defendant designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used underlying

11

chemicals and/or products added to AFFF which contained PFAS for use in firefighting and/or other PFAS-containing products or additives.

40.    Defendant Du Pont de Nemours Inc. (f/k/a DowDuPont, Inc.) ("DowDuPont"), is a Delaware corporation and does business throughout the United States. DowDuPont, has its principal place of business at 1007 Market Street, Wilmington, Delaware 19899.  DowDupont was created in 2015 to transfer Chemours and DuPont liabilities for manufacturing and distributing flurosurfactants to AFFF manufacturers.

41.    DowDuPont designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used AFFF containing PFAS that are used in firefighting training and response exercises which are the subject of this Complaint and/or other PFAS-containing products or additives. Further, defendant designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in firefighting and/or other PFAS-containing products or additives.

42.    Defendant Dynax Corporation ("Dynax") is a New York corporation that conducts business throughout the United States. Its principal place of business is 103 Fairview Park Drive, Elmsford, New York, 10523-1544.

43.    Dynax designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, sold, and/or otherwise handled and/or used AFFF containing PFAS that are the subject of this Complaint. Further, defendant designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials,

promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in firefighting.

44.     Defendant E. I. du Pont de Nemours and Company ("DuPont"), is a Delaware corporation and does business throughout the United States. DuPont has its principal place of business at 1007 Market Street, Wilmington, Delaware 19898.

45.     DuPont designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used AFFF containing PFAS that are used in firefighting training and response exercises which are the subject of this Complaint and/or other PFAS-containing products or additives. Further, defendant designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in firefighting and/or other PFAS-containing products or additives.

46.     Defendant Kidde-Fenwal, Inc. ("Kidde-Fenwal") is a corporation organized under the laws of the State of Delaware and does business throughout the United States. Kidde-Fenwal has its principal place of business at One Financial Plaza, Hartford, Connecticut 06101. Kidde-Fenwal is the successor-in-interest to Kidde Fire Fighting, Inc. (f/k/a Chubb National Foam, Inc. f/k/a National Foam System, Inc.) (collectively, "Kidde/Kidde Fire").

47.     Kidde-Fenwal designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used AFFF containing PFAS that are used in firefighting training and response exercises which are the subject of this Complaint and/or other PFAS-containing products or additives. Further, defendant designed, marketed, developed, manufactured, distributed, released, trained users,

produced instructional materials, promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in firefighting and/or other PFAS-containing products or additives.

48.     Defendant Kidde P.L.C., Inc. ("Kidde P.L.C.") is a foreign corporation organized and existing under the laws of the State of Delaware and does business throughout the United States. Kidde P.L.C. has its principal place of business at One Carrier Place, Farmington, Connecticut 06034. Upon information and belief, Kidde PLC was formerly known as Williams Holdings, Inc. and/or Williams US, Inc.

49.     Kidde designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used AFFF containing PFAS that are used in firefighting training and response exercises which are the subject of this Complaint and/or other PFAS-containing products or additives. Further, defendant designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in firefighting and/or other PFAS-containing products or additives.

50.     Defendant Nation Ford Chemical Company ("Nation Ford") is a South Carolina company and does business throughout the United States. Nation Ford has its principal place of business at 2300 Banks Street, Fort Mill, South Carolina 29715.

51.     Nation Ford designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used AFFF containing PFAS that are used in firefighting training and response exercises which are the subject of this Complaint and/or other PFAS-containing products or additives. Further,

defendant designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in firefighting and/or other PFAS-containing products or additives.

52.     Defendant National Foam, Inc. ("National Foam") is a Delaware corporation and does business throughout the United States. National Foam has its principal place of business at 141 Junny Road, Angier, North Carolina, 27501.

53.     National Foam designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used AFFF containing PFAS that are used in firefighting training and response exercises which are the subject of this Complaint and/or other PFAS-containing products or additives. Further, defendant designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in firefighting and/or other PFAS-containing products or additives.

54.     Defendant The Chemours Company ("Chemours"), is a Delaware corporation and does business throughout the United States. Chemours has its principal place of business 1007 Market Street, Wilmington, Delaware 19898. Upon information and belief, Chemours was spun off from DuPont in 2015 to assume PFAS related liabilities.

55.     Chemours designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used AFFF containing PFAS that are used in firefighting training and response exercises which are the subject of this Complaint and/or other PFAS-containing products or additives. Further,

defendant designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in firefighting and/or other PFAS-containing products or additives.

56.    Defendant Tyco Fire Products, LP, as successor-in-interest to The Ansul Company ("Tyco"), is a Delaware limited partnership and does business throughout the United States. Tyco has its principal place of business at 1400 Pennbrook Parkway, Lansdale, Pennsylvania 19466. Tyco manufactured and currently manufactures the Ansul brand of products, including Ansul brand AFFF containing PFAS.

57.    Tyco is the successor in interest to the corporation formerly known as The Ansul Company ("Ansul"). At all times relevant, Tyco/Ansul designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used AFFF containing PFAS that are used in firefighting training and response exercises which are the subject of this Complaint and/or other PFAS-containing products or additives. Further, defendant designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in firefighting and/or other PFAS-containing products or additives.

58.    Defendant United Technologies Corporation ("United Technologies") is a foreign corporation organized and existing under the laws of the State of Delaware and does business throughout the United States. United Technologies has its principal place of business at 8 Farm Springs Road, Farmington, Connecticut 06032.

16

59.     United Technologies designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used AFFF containing PFAS that are used in firefighting training and response exercises which are the subject of this Complaint and/or other PFAS-containing products or additives. Further, defendant designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in firefighting and/or other PFAS-containing products or additives.

60.     Defendant UTC Fire & Security Americas Corporation, Inc. (f/k/a GE Interlogix, Inc.) ("UTC") is a North Carolina corporation and does business throughout the United States. UTC has principal place of business at 3211 Progress Drive, Lincolnton, North Carolina 28092. Upon information and belief, Kidde-Fenwal, Inc. is part of the UTC Climate Control & Security unit of United Technologies Corporation.

61.     UTC designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used AFFF containing PFAS that are used in firefighting training and response exercises which are the subject of this Complaint and/or other PFAS-containing products or additives. Further, defendant designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in firefighting and/or other PFAS-containing products or additives.

62.     ABC Corporations (1-50) are the fictitious names of corporations, companies, partnerships and/or other business entities whose identities are currently unknown, and who

designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold, and/or otherwise released into the stream of commerce AFFF, other PFAS-containing products and/or underlying PFAS-containing chemicals or additives, including those products which contaminated Plaintiff's water sources.   These corporations are liable to Plaintiff for not only their own conduct and the conduct of their agents, employees and servants but also under *respondeat superior*, alter ego, agency principles and/or any corporate relationship.

63.     When reference is made in this Complaint to any act or omission of any of the Defendants, it shall be deemed that the officers, directors, agents, employees, or representatives of the Defendants committed or authorized such act or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation, or control of the affairs of Defendants, and did so while acting within the scope of their duties, employment, or agency.

64.     Any and all references to a Defendant or Defendants in this Complaint include any predecessors, successors, parents, subsidiaries, affiliates, and divisions of the named Defendants.

## JURISDICTION AND VENUE

65.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 inasmuch as the Plaintiff and all the Defendants are citizens of different states and the amount in controversy in this matter, exclusive of interest and costs, exceeds the sum of $75,000.

66.     Plaintiff is direct-filing this Complaint and Jury Demand in the United States District Court for the District of South Carolina as permitted by Case Management Orders Nos.

3D & 3E entered by this Court in In Re: Aqueous Film-Forming Foams Products Liability Litigation, MDL No. 2:18-mn-2873-RMG.

67.    The United States District Court for the District of New Jersey is the proper venue of origin where Plaintiff's claims could have otherwise been brought pursuant to 28 U.S.C. § 1391.

68.    The United States District Court for the District of New Jersey is the proper "Home Venue" because, based on information and belief, each Defendant is a corporation or other business that has sufficient minimum contacts in the State of New Jersey or otherwise intentionally availed and/or avails itself of the New Jersey market either through the distribution or sale of AFFF or other PFAS-containing products in the State of New Jersey so as to render the exercise of jurisdiction over it by this Court consistent with traditional notions of fair play and substantial justice.

69.    Further, Venue is also proper in the United States District Court for the District of New Jersey under 28 U.S.C. § 1391(b)(2) because the events, omissions, and harms that are the basis of Plaintiff's claims occurred in substantial part in this judicial district.

70.    Plaintiff brings causes of action based solely on and arising under New Jersey Law. The claims of Plaintiff are for violations of New Jersey law that occurred exclusively in the State of New Jersey.

## GENERAL FACTUAL ALLEGATIONS

### A.    PFOA and PFOS, Their Chemical Characteristics, and Risk in Groundwater

71.    Poly- and perfluroalkyl substances (collectively "PFAS compounds") are terms used to describe a group of organic flurorinated alkanes. PFAS compounds have been used for decades to produce products that are heat resistant, stain resistant, long lasting, and water and oil repellant.

72.     There are six long-chain PFAS compounds, which are divided into two sub-categories: (1) long-chain perfluoraoalkyl carboxylic acids (PFCAs) like PFOA, and (2) perfluoroalkane sulfonates (PFSAs), including perfluorohexane sulfonate (PFHxS) and PFOS. PFOS and PFOA compounds are the most toxic manmade chemicals of the PFAS family.

73.     PFOS and PFOA are characterized by a carbon-fluorine ("C-F") bond that is one of the strongest chemical bonds that occurs. PFOS and PFOAs are extremely persistent in the environment and in the human body, and have the potential to bioaccumulate and biomagnify in wildlife. Bioaccumulation appears to be related to the length of the C-F chain; as the size of the chain increases, the compound becomes more bioaccumulative.

74.     PFOS and PFOA have unique characteristics that cause extensive and persistent environmental contamination. Specifically, they are (1) mobile—that is, because they do not adsorb (stick) to soil particles, they are readily transported through the soil and into groundwater where they can migrate long distances; and (2) persistent—that is, they do not readily biodegrade or chemically degrade in the environment or in conventional treatment systems for drinking water. In short, once PFOS and/or PFOA are applied, discharged, disposed of, or otherwise released onto land, those compounds migrate through the subsurface and into groundwater, resist natural degradation, and are difficult and costly to remove from water.

75.     PFOA and PFOS contamination presents a significant threat to public health and welfare. PFOA is readily absorbed in the body after consumption or inhalation, and it accumulates primarily in the blood stream, kidney, and liver. Studies have shown that exposure to fluorochemicals that contain eight carbons or more ("C8"), such as PFOS and PFOA, may cause testicular cancer, kidney cancer, and liver damage in adults, as well as developmental effects to

fetuses during pregnancy or to breast-fed infants, including low birth weight, accelerated puberty, and skeletal variations.

76.     There also have been studies linking C8s with autoimmune and endocrine disorders, elevated cholesterol, increased liver enzymes, decreased vaccination response, thyroid disease, and pregnancy-induced hypertension and preeclampsia (a serious pregnancy complication). These injuries may arise within months or years after exposure to PFOS or PFOA.

77.     Under the U.S. Environmental Protection Agency's ("EPA") Guidelines for Carcinogen Risk Assessment, there is "Suggestive Evidence of Carcinogenic Potential" for PFOS and PFOA in humans.

**B.     Defendants' History of Production of PFOA/PFOS and Commercialization of PFAS-Containing Products**

78.     3M began producing PFOA as part of a process called electrochemical fluorination (ECF) in the 1940s. This process results in a product that contains and/or breaks down into compounds containing PFOA and/or PFOS.

79.     For most of the past 30 years, the primary manufacturer of PFOS and PFOA has been 3M, through its supply of AFFF.

80.     In the 1960s, 3M began developing AFFF, which was created to extinguish Class B fires that are fueled by flammable liquid and particularly difficult to fight using traditional methods of extinguishing fires. Class B fires cannot be safely extinguished with water.

81.     AFFFs are synthetically formed by combining fluorine free hydrocarbon foaming agents with highly fluorinated surfactants. When mixed with water, a solution forms producing aqueous film that spreads across the surface of a hydrocarbon fuel. This film formation feature is what provides the fire extinguishment.

82. 3M manufactured, marketed, and sold AFFF and the raw materials for production of AFFF from the 1960s to the early 2000s.

83. National Foam and Tyco/Ansul began to manufacture, market, and sell AFFF in the 1970s.

84. Angus Fire and Chemguard began to manufacture, market, and sell AFFF in the 1990s.

85. Dynax began to manufacture, market, and sell the raw materials for production of AFFF in the 1990s and quickly became a leading global producer of fluorosurfactants and fluorochemical foam stabilizers used in firefighting foam agents.

86. Buckeye began to manufacture, market, and sell AFFF in the 2000s.

87. After its creation in the 1960s and entrance into the commercial market, AFFF was utilized by the Department of Defense and the US Navy to extinguish fuel-based fires during routine military drills. AFFF was also used in hundreds of bases across the country.

88. Beginning in 1951, DuPont began purchasing PFOA from 3M for use in the manufacturing process for its name-brand product Teflon®, commonly known for its use as a coating for non-stick cookware.

89. In 2000, 3M announced it would phase out and find substitutes for its PFOS chemistry.

90. In 2001, DuPont became a founding member of the Fire Fighting Foam Coalition ("FFFC").

91. In part, through its involvement in the FFFC, DuPont actively marketed its fluorosurfactants to AFFF manufacturers for use in the production of AFFF.

92.     Some or all of the AFFF manufactured and sold by the Defendants contained fluorosurfactants manufactured and sold by DuPont.

93.     In response to pressure from the United States Environmental Protection Agency ("EPA"), 3M began to phase out production of PFOS and PFOA products in 2000.

94.     On May 16, 2000, 3M issued a news release asserting that "our products are safe," citing the company's "principles of responsible environmental management" as the reason to cease production.

95.     On the same day as 3M's phase out announcement, an EPA press release stated: "3M data supplied to EPA indicated that these chemicals are very persistent in the environment, have a strong tendency to accumulate in human and animal tissues and could potentially pose a risk to human health and the environment over the long term."

96.     In a memo explaining its decision, EPA stated that PFOS "appears to combine Persistence, Bioaccumulation, and Toxicity property to an extraordinary degree."

97.     After 3M exited the AFFF market, the remaining Defendants continued to manufacture and sell AFFF.

98.     The Defendants knew their customers warehoused large stockpiles of AFFF and touted the shelf-life of AFFF.

99.     While the Defendants phased out production or transitioned to new formulas of AFFF, they did not instruct users of AFFF that they should not use AFFF that contained PFOS, PFOA, PFNA and/or PFHxS, and/or their precursors.

100.    The Defendants further did not act to remove AFFF from the stream of commerce.

101.    The Defendants did not warn public entities or others that AFFF would harm the environment, endanger human health, or cause them to incur substantial costs to investigate and clean up contamination of public water drinking wells.

102.    Accordingly, for many years after the original sale of AFFF, these AFFF products were and are still being applied directly to the ground, discharged into floor drains and washed into sediments, soils and waters, contamination public drinking water wells and endangering human health.

103.    The Defendants did not properly instruct users, consumers, public officials or those who were in a position to properly guard against the dangers of PFAS, that they needed to properly dispose of their stockpiles of AFFF or how to properly dispose of AFFF.

104.    Additionally, Defendants manufactured and/or supplied PFAS-containing products or additives that were used in the manufacturing of and/or incorporated into consumer and commercial products.  As a result of these other PFAS-containing products, PFAS, particularly PFOA and PFOS, also may have directly entered the environment through different pathways of contamination to aquifers and/or ground or surface waters, which were released and/or migrated into Plaintiff's water sources.

105.    In the same way that PFAS are released from consumer products through their disposal in landfills, PFAS are also released from consumer products directly into the wastewater stream, e.g., by laundering PFAS-coated clothing, through use of PFAS-containing home care products, like Scotchguard®, Stainmaster®, Polartec®, and Gore-tex® fabric coatings and cleaners, paper and food package coatings like Zonyl®, and through use of PFAS-containing cook wear, including Teflon®.

106.    Upon information and belief, the Defendants, sold PFAS, PFAS-containing products and/or PFAS-containing chemicals or additives to companies with New Jersey locations that Defendants knew or should have known would be used and/or disposed of in New Jersey

1.    **3M's Knowledge of the Dangers of PFAS**

107.    In the 1950s, based on its own internal studies, 3M concluded that PFAS are "toxic."

108.    3M knew as early as the mid-1950s that PFAS bioaccumulate in humans and animals.

109.    By the early 1960s, 3M understood that some PFAS are stable and persist in the environment and that they do not degrade.

110.    3M knew as early as 1960 that chemical wastes from its PFAS manufacturing facilities that were dumped to landfills could leach into groundwater and otherwise enter the environment.

111.    An internal memo from 1960 described 3M's understanding that such wastes "[would] eventually reach the water table and pollute domestic wells."

112.    As early as 1963, 3M was aware that its PFAS products were stable in the environment and would not degrade after disposal.

113.    3M began monitoring the blood of its employees for PFAS, as early as 1976, because 3M was concerned about health effects of PFAS.

114.    3M documents from 1977 relating to these worker tests further confirm that PFAS bioaccumulate.

115.    By at least 1970, 3M was aware that its PFAS products were hazardous to marine life.

116.    One study of 3M's PFAS around this time had to be abandoned to avoid severe local pollution of nearby surface waters.

117.    In 1975, 3M found there was a "universal presence" of PFOA in blood serum samples taken from across the United States.

118.    Since PFOA is not naturally occurring, this finding reasonably should have alerted 3M to the likelihood that its products were a source of this PFOA—a possibility that 3M considered internally but did not share outside the company.

119.    This finding also should have alerted 3M to the likelihood that PFOA is mobile, persistent, bioaccumulative, and biomagmifying, as those characteristics would explain the presence of PFOA in blood from 3M's products.

120.    Other studies by 3M in 1978 showed that PFOA and PFOS are toxic to monkeys.

121.    In the late 1970s, 3M studied the fate and transport characteristics of PFOS in the environment.

122.    3M resisted calls from its own ecotoxicologists going back to 1979 to perform an ecological risk assessment on PFOS and similar chemicals.

123.    3M's own ecotoxicologists continued raising concerns to 3M until at least 1999.

124.    In 1983, 3M scientists opined that concerns about PFAS "give rise to legitimate questions about the persistence, accumulation potential, and ecotoxicity of [PFAS] in the environment."

125.    In 1984, 3M's internal analyses demonstrated that PFAS were likely bioaccumulating in 3M fluorochemical employees.

126.    3M's own employees recognized that 3M was concealing known dangers relating to PFAS. For example, in a 1999 resignation letter, an employee stated that "I can no longer

participate in the process that 3M has established for the management of [PFAS.] For me, it is unethical to be concerned with markets, legal defensibility and image over environmental safety."

127.    In response to pressure from the U.S. EPA, 3M began to phase out production of PFOS and PFOA products in 2000.

128.    On May 16, 2000, 3M issued a news release asserting that "our products are safe," citing the company's "principles of responsible environmental management" as the reason to cease production.

129.    On the same day as 3M's phase out announcement, an EPA press release stated: "3M data supplied to EPA indicated that these chemicals are very persistent in the environment, have a strong tendency to accumulate in human and animal tissues and could potentially pose a risk to human health and the environment over the long term."

130.    3M knew or should have known that in their intended and/or common use, products containing PFAS would very likely injure and/or threaten public health and contaminate the environment.

131.    Despite overwhelming studies to the contrary, 3M, to this day, publicly claims that "[w]e do not believe that PFOS and PFOA cause harm to human health at levels that are typically found in the environment" and that "[w]e do not believe there is a public health issue related to PFOA and PFOS."

**2.    Dupont's Knowledge of the Dangers of PFAS**

132.    DuPont company scientists issued internal warnings about the toxicity associated with their PFOA products as early as 1961.

133.    DuPont's Toxicology Section Chief opined that such products should be "handled with extreme care," and that contact with the skin should be "strictly avoided."

27

134.    In 1978, based on information it received from 3M about elevated and persistent fluorine levels in workers exposed to PFOA, DuPont initiated a plan to review and monitor the health conditions of potentially exposed workers in order to assess whether any negative health effects could be attributed to PFOA exposure.

135.    This monitoring plan involved obtaining blood samples from the workers and analyzing them for the presence of fluorine.

136.    By 1979, DuPont had data indicating that its workers exposed to PFOA had a significantly higher incidence of health issues than did unexposed workers.

137.    DuPont did not report this data or the results of its worker health analysis to any government agency or community.

138.    The following year, DuPont internally confirmed that PFOA "is toxic," that humans accumulate PFOA in their tissue, and that "continued exposure is not tolerable."

139.    Not only did DuPont know that PFOA accumulates in humans, but it was also aware that PFOA could cross the placenta from an exposed mother to her gestational child.

140.    In fact, DuPont had reported to EPA in March 1982 that results from a rat study showed PFOA crossing the placenta if present in maternal blood, but DuPont concealed the results of internal studies of its own plant workers.

141.    While DuPont knew about this toxicity danger as early as the 1960s, DuPont also was aware that PFAS was capable of contaminating the surrounding environment.

142.    Further, no later than 1984, DuPont was aware that PFOA is biopersistent.

143.    DuPont was long aware that the PFAS it was releasing from its facilities was leaching into groundwater used for public drinking water.

144.    After obtaining data on these releases and the consequent contamination near DuPont's plant in West Virginia, DuPont, in 1984, held a meeting at its corporate headquarters in Wilmington, Delaware, to discuss health and environmental issues related to PFOA (the "1984 Meeting").

145.    DuPont employees who attended the 1984 Meeting discussed available technologies that were capable of controlling and reducing PFOA releases from its manufacturing facilities, as well as potential replacement materials.

146.    DuPont chose not to use either available technologies or replacement materials, despite knowing of PFOA's toxicity.

147.    During the 1984 Meeting, DuPont employees in attendance spoke of the PFOA issue as "one of corporate image, and corporate liability."

148.    They were resigned to DuPont's "incremental liability from this point on if we do nothing" because DuPont was "already liable for the past 32 years of operation."

149.    They also stated that the "legal and medical [departments within DuPont] will likely take the position of total elimination" of PFOA use in DuPont's business, and that these departments had "no incentive to take any other position."

150.    DuPont's own Epidemiology Review Board ("ERB") repeatedly raised concerns about DuPont's statements to the public that there were no adverse health effects associated with human exposure to PFOA.

151.    For example, in February 2006, the ERB "strongly advise[d] against any public statements asserting that PFOA does not pose any risk to health" and questioned "the evidential basis of [DuPont's] public expression asserting, with what appears to be great confidence, that PFOA does not pose a risk to health."

29

152.    DuPont knew or should have known that in their intended and/or common use, products containing PFAS would very likely injure and/or threaten public health and the environment.

### 3.    Other Defendant's Knowledge of the Dangers of PFAS

153.    The Defendants, other than 3M and Dupont, knew, or at the very least should have known, that in their intended and/or common use, their AFFF and/or PFAS-containing products would harm human health and the environment, including causing harm to Plaintiff.

154.    The Defendants, other than 3M and Dupont, knew, or at the very least should have known that, their AFFF and/or other PFAS-containing  products would contaminate Plaintiff's public water supply.

155.    Information regarding PFAS compounds was readily accessible to each of the above-referenced Defendants for decades because each is an expert in the field of AFFF and/or PFAS-containing products manufacturing and/or the materials needed to manufacture AFFF and/or PFAS containing products, and each has detailed information and understanding about the chemical compounds that form AFFF and/or other PFAS-containing products.

156.    The Firefighting Foam Coalition ("FFFC"), an AFFF trade group, was formed in 2001 to advocate for AFFF's continued viability.

157.    DuPont, which as is described above had extensive knowledge about the toxicity associated with PFAS, was a member of the FFFC.

158.    All of the Defendants, with the exception of 3M, were members of the FFFC ("FFFC Defendants").

159.    Through their involvement in the FFFC, as well as a variety of other trade associations and groups, FFFC Defendants shared knowledge and information regarding PFOA.

160.    The FFFC Defendants worked together to protect AFFF from scrutiny.

161.    Their close cooperation included messaging on PFOA's toxicological profile.

162.    The FFFC's efforts were designed to shield its members and the AFFF industry from the detrimental impact of the public and regulators learning about the harms of PFOA to human health and the environment.

163.    FFFC Defendants regularly published newsletters and attended conferences bolstering their AFFF products.

164.    These coordinated efforts by the FFFC Defendants were meant to dispel concerns about the impact AFFF had on the environment and human health. They worked in concert to conceal known risks of their AFFF from the government and public.

165.    FFFC Defendants repeated the same message for years: Only one PFAS chemical, PFOS, had been taken off the market. Since the FFFC Defendants' products did not contain PFOS, they claimed their products were safe.

166.    FFFC Defendants knew the use of their AFFF products presented a similar threat to human health and the environment.

167.    While this was known to FFFC Defendants, it was not fully understood by the users of AFFF, the public and Plaintiff.

**4.     Dupont's Spinoff of Chemours**

168.    In February 2014, DuPont formed The Chemours Company as a wholly-owned subsidiary.

169.    In July 2015, DuPont used Chemours to spin off its "performance chemicals" business line.

170.    At the time of the spinoff, the performance chemicals division consisted of DuPont's Titanium Technologies, Chemical Solutions and Fluorochemicals segments (the "Performance Chemicals Business").

171.    Until the spinoff was complete, Chemours was a wholly-owned subsidiary of DuPont. Although Chemours had a separate board, the board was controlled by DuPont employees.

172.    Prior to the spinoff of Chemours, in 2005, DuPont agreed to pay $10.25 million to resolve eight counts brought by the United Stated Environmental Protection Agency ("EPA") alleging violations of the Toxic Substances Control Act ("TSCA") and the Resource Conservation and Recovery Act ("RCRA") concerning the toxicity of PFAS compounds. At the time, it was the largest such penalty in history.

173.    DuPont also promised to phase out production and use of PFOA by 2015.

174.    Also in 2005, DuPont settled a class action lawsuit filed on behalf of 70,000 residents of Ohio and West Virginia for $343 million.

175.    Under the terms of the 2005 class action settlement, DuPont agreed to fund a panel of scientists to determine if any diseases were linked to PFOA exposure, to filter local water for as long as C-8 concentrations exceeded regulatory thresholds, and to set aside $235 million for ongoing medical monitoring of the affected community.

176.    After 8 years, the C-8 Science Panel found several significant diseases, including cancer, linked to PFOA.

177.    Once the spinoff was complete, seven new members of the Chemours board were appointed, for an eight member board of directors of the new public company.

178.    The new independent board appointed upon the completion of the spinoff did not take part in the negotiations of the terms of the separation.

179.   In addition to the transfer of assets, Chemours accepted broad assumption of liabilities for DuPont's historical use, manufacture, and discharge of PFAS, although the specific details regarding the liabilities that Chemours assumed are set forth in the non-public schedules.

180.   Within the publicly available information about the transfer is the fact that Chemours agreed to indemnify DuPont against, and assumed for itself, all "Chemours Liabilities," which is defined broadly to include, among other things, "any and all liabilities relating," "primarily to, arising primarily out of or resulting primarily from, the operation of or conduct of the [Performance Chemicals] Business at any time."

181.   Chemours agreed to indemnify DuPont against and assume for itself the Performance Chemical Business's liabilities regardless of: (i) when or where such liabilities arose; (ii) whether the facts upon which they are based occurred prior to, on, or subsequent to the effective date of the spinoff; (iii) where or against whom such liabilities are asserted or determined; (iv) whether arising from or alleged to arise from negligence, gross negligence, recklessness, violation of law, fraud or misrepresentation by any member of the DuPont group or the Chemours group; and (v) which entity is named in any action associated with any liability.

182.   Chemours agreed to indemnify DuPont from, and assume all, environmental liabilities that arose prior to the spinoff if they were "primarily associated" with the Performance Chemicals Business.

183.   Such liabilities were deemed "primarily associated" if DuPont reasonably determined that 50.1% of the liabilities were attributable to the Performance Chemicals Business.

184.   Chemours also agreed to use its best efforts to be fully substituted for DuPont with respect to "any order, decree, judgment, agreement or Action with respect to Chemours Assumed Environmental Liabilities ...."

185.     In addition to the assumption of such liabilities, Chemours also provided broad indemnification to DuPont in connection with these liabilities, which is uncapped and does not have a survival period.

186.     The effect of creation of Chemours was to segregate a large portion of DuPont's environmental liabilities, including liabilities related to its PFAS chemicals and products.

187.     The consolidation of DuPont's performance chemical liabilities has potentially limited the availability of funds arising out of DuPont's liability.

188.     As Chemours explained in its November 2016 SEC filing: "[s]ignificant unfavorable outcomes in a number of cases in the [Ohio] MDL could have a material adverse effect on Chemours consolidated financial position, results of operations or liquidity."

189.     At the time of the transfer of its Performance Chemicals Business to Chemours, DuPont had been sued, threatened with suit and/or had knowledge of the likelihood of litigation to be filed regarding DuPont's liability for damages and injuries from the manufacture of PFAS compounds and products that contain PFAS compounds.

C.     **Contamination to the Lakewood Township Municipal Utilities Authority's Water Sources**

190.     The Lakewood Township Municipal Utilities Authority obtains its drinking water sources from aquifers and/or surface and ground water.

191.     To access these water sources, the Lakewood Township Municipal Utilities Authority relies on a system of wells, which transmit water to Lakewood Township Municipal Utilities Authority's treatment facilities.

192.     There, the water is aerated, softened, settled, filtered, disinfected, and pumped through water distribution mains and service lines, which service residential and commercial connections in the Township of Lakewood.

193.    Although the Water Treatment Facilities contain various technologies to ensure high quality water, they did and/or do not contain the specialized filtration technology required to remove PFOS and PFOA from Plaintiff's water supplies.

194.    The Lakewood Township Municipal Utilities Authority is committed to the supply of potable drinking water consistent with federal and state guidelines and requirements. The Lakewood Township Municipal Utilities Authority must implement remedies to assure that the water it supplies to its residents and customers meets these standards.

195.    As a direct result of Defendants' actions and inactions, the Lakewood Township Municipal Utilities Authority has had to address PFAS contamination. In doing so, the Lakewood Township Municipal Utilities Authority has conducted and continues to conduct sampling, studies and investigations related to PFAS, which requires funding by the Lakewood Township Municipal Utilities Authority, including costs for its personnel to supervise the assessments, costs to develop PFAS treatment scenarios and costs to analyze available alternatives.

196.    The Lakewood Township Municipal Utilities Authority has incurred, and will continue to incur, significant costs, for capital improvements such as the installation of Granular Activated Carbon ("GAC") adsorption to reduce and/or remove PFAS contamination, and other adjustments such as installing new connections between well fields to assure sufficient non-PFAS impacted water supplies. Operation and maintenance measures for these improvements are ongoing and add further to the costs that the Lakewood Township Municipal Utilities Authority has incurred and will incur in the future to address Defendants' PFAS contamination.

## V. CAUSES OF ACTION

### FIRST COUNT
### Strict Liability (Abnormally Dangerous Activity)

197.    Plaintiff incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if they were set forth at length herein.

198.    Defendants engaged in the design, manufacturing, marketing, and sales of PFAS chemicals and products containing PFAS, which Defendants knew or should have known, would result in contamination of the environment, including the aquifers, surface waters and/or groundwater that serve as water sources for Plaintiff's public water supply system, thereby causing damage to Plaintiff.

199.    Defendants knew or should have known of the adverse impacts the exposure to its PFAS compounds would have on the environment and the activities and rights of others.

200.    Defendants knew or should have known of the persistence and high mobility of PFAS in the environment, and the foreseeable risk that their PFAS and PFAS-containing products would be discharged, released, or disposed of in the environment.

201.    By causing PFAS contamination and the resulting impact to Plaintiff's public water supply systems, Defendants engaged in abnormally dangerous activity(ies) for which they are strictly liable.

202.    As a result of Defendants' abnormally dangerous activity(ies), Plaintiff has incurred, and will continue to incur, investigation, cleanup, remediation, and removal costs and damages related to PFAS contamination.

203.    As a direct and proximate result of Defendants' acts and omissions and their abnormally dangerous activity(ies), the Lakewood Township Municipal Utilities Authority has had to remove some of its wells from service, expend significant sums to investigate the source

36

and extent of the contamination, and/or expend significant sums to plan for treatment of its water to make it safe.

204.    As a direct and proximate result of Defendants' acts and omissions and their abnormally dangerous activity(ies), the Lakewood Township Municipal Utilities Authority has incurred and will incur additional costs for the construction of water treatment facilities capable of removing PFOS and PFOA from its water supply, additional costs in the future for the operation and maintenance of those water treatment facilities and additional costs complying with federal and state regulations or guidelines arising from PFAS, including PFOS and PFOA, contamination of Plaintiff's aquifers, groundwater and surface water sources and/or drinking water.

205.    Defendants' distribution of their defective products, despite their knowledge of the defects, including the increased risks of widespread contamination of the groundwater, surface water, and drinking water supplies with toxic and carcinogenic chemicals and the risks to the unsuspecting residents in surrounding areas was so reckless or wanting in care that it constituted a conscious disregard and/or indifference to the life, safety, or rights of the Plaintiff and the residents and businesses who rely on the drinking water that Plaintiff provides.

206.    Defendants' conduct was so reckless or wanting in care that it constituted intentional misconduct.

## SECOND COUNT

### Strict Liability (Failure to Warn)

207.    Plaintiff incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if they were set forth at length herein.

208.    At all times relevant, Defendants were in the business of, among other things, designing, manufacturing, selling, or otherwise distributing AFFF and/or PFAS surfactants for use in or manufacture of AFFF and/or other products.

209.    At all times relevant to this litigation, Defendants' AFFF and PFAS surfactants for use in or manufacture of AFFF and/or other products reached their intended consumers and users without substantial change in their  conditions as designed, manufactured, sold, distributed, labeled and marketed by Defendants.

210.    As manufacturers, sellers, or distributors of a commercial product, the Defendants had a duty to warn of the foreseeable risks associated with the reasonably foreseeable uses of their products.

211.    As manufacturers, sellers, or distributors of a commercial product, the Defendants had a duty to provide reasonable instructions on the proper and safe use, storage and disposal of their AFFF and/or PFAS surfactants for use in or manufacture of AFFF and/or other products.

212.    Defendants, as manufacturers, sellers, and distributors of AFFF and/or PFAS surfactants for use in or manufacture of AFFF and/or other products placed into the stream of commerce, are deemed experts with respect to their products.

213.    The generally recognized and prevailing best scientific and medical knowledge at all times relevant demonstrated that the Toxic Surfactants in Defendants' AFFF and/or PFAS surfactants for use in or manufacture of AFFF and/or other products could contaminate groundwater and local drinking water supplies with toxic and carcinogenic chemicals.

214.    The generally recognized and prevailing best scientific and medical knowledge at all times relevant demonstrated that the Toxic Surfactants in Defendants' AFFF and/or PFAS

surfactants for use in AFFF had the capacity to enter the water supply, to persist there for decades, and to cause harm to human health and the environment.

215.    The Defendants failed to provide warnings for the reasonably foreseeable risk that use of Defendants' AFFF and/or PFAS surfactants for use in or manufacture of AFFF and/or other products could result in the contamination of aquifers, groundwater and/or surface water and, ultimately, drinking water supplies.

216.    Defendants knew or should have known that the minimal warnings disseminated with their AFFF and/or PFAS surfactants for use in or manufacture of AFFF and/or other products were inadequate.

217.    Adequate instructions and warnings would have reduced or avoided the foreseeable risks of harm posed by Defendants' AFFF and/or PFAS surfactants for use in or manufacture of AFFF and/or other products.

218.    Had Defendants provided adequate instructions and warnings, the contamination of the aquifers, groundwater and/or surface water and drinking water supply with toxic and carcinogenic chemicals would have been reduced or eliminated.

219.    Defendants' failure to provide adequate warnings and instructions renders Defendants' AFFF and/or PFAS surfactants for use in or manufacture of AFFF and/or other products unreasonably dangerous and defective products.

220.    Plaintiff could not have reasonably discovered the defects and risks associated with use of Defendants' AFFF and/or PFAS surfactants for use in or manufacture of AFFF and/or other products.

221.    As a result of Defendants' design, manufacture, sale, or distribution of a defective product, Defendants are strictly liable in damages to the Plaintiff.

222.    As a direct and proximate result of Defendants' failure to warn against the likelihood of contamination,  the aquifers, groundwater, surface water and/or drinking water in and around Lakewood Township and/or the water sources for the Lakewood Township Municipal Utilities Authority became and remain contaminated with PFOS and PFOA.

223.    As a direct and proximate result of Defendants' failure to warn of the potential for aquifer, groundwater, surface water and/or drinking water contamination, the Lakewood Township Municipal Utilities Authority has had to remove some of its wells from service, expend significant sums to investigate the source and extent of the contamination, and/or expend significant sums to plan for treatment of its water to make it safe.

224.    As a direct and proximate result of Defendants' failure to warn of the potential for aquifer, groundwater, surface water and/or drinking water contamination, the Lakewood Township Municipal Utilities Authority has incurred and will incur additional costs for the construction of a water treatment facilities capable of removing PFOS and PFOA from its water supply, additional costs in the future for the operation and maintenance of that water treatment facilities and additional costs complying with federal and state regulations and guidelines arising from PFAS, including PFOS and PFOA, contamination of Plaintiff's aquifers, groundwater and surface water sources and/or drinking water.

225.    Defendants' distribution of their defective products, despite their knowledge of the defects, including the increased risks of widespread contamination of the groundwater, surface water, and drinking water supplies with toxic and carcinogenic chemicals and the risks to the unsuspecting residents in surrounding areas was so reckless or wanting in care that it constituted a conscious disregard and/or indifference to the life, safety, or rights of the Plaintiff and the residents and businesses who rely on the drinking water that Plaintiff provides.

226.    Defendants' conduct was so reckless or wanting in care that it constituted intentional misconduct.

### THIRD COUNT

### Strict Liability (Design Defect)

227.    Plaintiff incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if they were set forth at length herein.

228.    At all times relevant, Defendants were in the business of, among other things, manufacturing, selling, or otherwise distributing AFFF and/or PFAS surfactants for use in or manufacture of AFFF and/or other products.

229.    As manufacturers, sellers, or distributors, Defendants had a duty to make and/or market AFFF or chemicals for use in and manufacture of AFFF and/or other products that were free from a defective condition unreasonably dangerous to persons that foreseeably would come into contact with it.

230.    Defendants breached that duty because the AFFF and/or PFAS surfactants for use in or manufacture of AFFF and/or other products that they manufactured, sold or distributed was dangerous to an extent beyond that contemplated by an ordinary consumer when used in its intended and reasonably foreseeable manner.

231.    Defendants, as manufacturers, sellers, and distributors of AFFF and/or PFAS surfactants for use in or manufacture of AFFF and/or other products placed into the stream of commerce, are deemed experts with respect to their product.

232.    Defendants knew or should have known that the Toxic Surfactants contained in their AFFF and/or PFAS surfactants for use in or manufacture of AFFF and/or other products were

toxic and carcinogenic and could lead those exposed to those toxic chemicals and/or their breakdown products to develop serious medical conditions.

233.    Defendants knew or should have known that the foreseeable storage, use and disposal of the AFFF and/or PFAS surfactants for use in or manufacture of AFFF and/or other products that they manufactured, sold, and distributed had the capacity to enter the water supply, to persist there for decades, and to cause harm to human health and the environment.

234.    Defendants knew or should have known that the foreseeable storage, use and disposal of the AFFF and/or PFAS surfactants for use in or manufacture of AFFF and/or other products that they manufactured, sold, and distributed would require those who used aquifers, groundwater, and/or surface water in the vicinity of areas where AFFF was stored, used, or released, including Plaintiff, to design, install, operate and maintain costly filtration devices to make the water safe for human use and consumption.

235.    The risks of AFFF and/or PFAS surfactants for use in or manufacture of AFFF and/or or other products were not obvious to Plaintiff.

236.    Plaintiff could not have reasonably discovered the defects and risks associated with use of AFFF and/or PFAS surfactants for use in or manufacture of AFFF or other products.

237.    Defendants' AFFF and/or PFAS surfactants for use in or manufacture of AFFF and/or other products were far more dangerous than an ordinary consumer would expect when used, as designed, in its intended or reasonably foreseeable manner.

238.    Defendants' AFFF and/or PFAS surfactants for use in or manufacture of AFFF and/or other products were, therefore, unreasonably dangerous.

239.    Defendants' AFFF and/or PFAS surfactants for use in or manufacture of AFFF and/or other products were, therefore, defective.

240.     As a result of Defendants' manufacture, sale, or distribution of a defective product, Defendants are strictly liable in damages to the Plaintiff.

241.     As a direct and proximate result of Defendants' design defect(s), the Lakewood Township Municipal Utilities Authority has had to remove some of its wells from service, expend significant sums to investigate the source and extent of the contamination, and/or expend significant sums to plan for treatment of its water to make it safe.

242.     As a direct and proximate result of Defendants' design defect(s), the Lakewood Township Municipal Utilities Authority has incurred and will incur additional costs for the construction of a water treatment facilities capable of removing PFOS and PFOA from its water supply, additional costs in the future for the operation and maintenance of that water treatment facilities and additional costs complying with federal and state regulations arising from PFAS, including PFOS and PFOA, contamination of Plaintiff's aquifers, groundwater and surface water sources and/or drinking water.

243.     Defendants' distribution of their defective products, despite their knowledge of the defects, including the increased risks of widespread contamination of the aquifers, groundwater, surface water, and drinking water supplies with toxic and carcinogenic chemicals and the risks to the unsuspecting residents in surrounding areas was so reckless or wanting in care that it constituted a conscious disregard and/or indifference to the life, safety, or rights of the Plaintiff and the residents and businesses who rely on the drinking water that Plaintiff provides.

244.     Defendants' conduct was so reckless or wanting in care that it constituted intentional misconduct.

## FOURTH COUNT

### Negligence

245.    Plaintiff incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if they were set forth at length herein.

246.    The Defendants had a duty to manufacture, market, and sell their AFFF and/or PFAS surfactants for use in or manufacture of AFFF and/or other products in a manner that avoided harm to those who foreseeably would come into contact with it.

247.    Defendants knew or should have known that the manufacture of AFFF and/or PFAS surfactants for use in or manufacture of AFFF or other products containing Toxic Surfactants was hazardous to human health and the environment.

248.    Defendants further knew or should have known that it was unsafe and/or unreasonably dangerous to manufacture AFFF and/or PFAS surfactants for use in or manufacture of AFFF and/or other products using Toxic Surfactants because it was a near certainty that the chemicals would migrate from the locations where they were used and contaminate the aquifers, ground water, surface water and/or drinking water supply in the surrounding areas.

249.    Defendants knew or should have known that the Toxic Surfactants used in the manufacture of their AFFF and/or PFAS surfactants for use in or manufacture of AFFF and/or other products do not degrade, remain in the environment for decades, and bioaccumulate, thereby creating a potential health risk that could last for many years.

250.    Plaintiff was a foreseeable victim of the harm caused by Defendants' AFFF and/or PFAS surfactants for use in or manufacture of AFFF and/or other products.

251.    As a result of Defendants' breach of their legal duties, the drinking water wells and/or sources on which Plaintiff relies to provide potable water to its customers became and remain contaminated with unsafe levels of PFOS and PFOA.

252.    Plaintiff has suffered and will continue to suffer damages and costs and expenses in the future.

253.    Defendants' manufacture, marketing, and sale of AFFF and/or PFAS surfactants for use in or manufacture of AFFF and/or other products, despite their knowledge of the risks of widespread contamination of the groundwater and drinking water supplies with toxic and carcinogenic chemicals, including Plaintiff's, among other reasons, demonstrates that Defendants' conduct was willful, wanton or reckless, and undertaken with a reckless indifference to the rights of Plaintiff.

## FIFTH COUNT

### Private Nuisance

254.    Plaintiff incorporates by reference the allegations set forth in the previous paragraphs of this Complaint as if they were set forth at length herein.

255.    Defendants' wrongful conduct resulted in the interference with Plaintiff's right to the use of aquifers, groundwater and/or surface water for providing potable water to its customers through the invasion of hazardous and toxic substances into the Plaintiff's wells.

256.    The Defendants are liable for a nuisance because their conduct was the legal cause of an invasion of the Plaintiff's interest in the use of aquifers, groundwater and/or surface water, and the invasion was intentional and otherwise actionable under the rules controlling liability for negligent or reckless conduct.

257.    Defendants' negligent, reckless and wanton acts proximately caused Plaintiff's property damage.

258.    As a direct and proximate result of the acts and omissions of Defendants, the Lakewood Township Municipal Utilities Authority has suffered damages including, but not limited to, the loss of the beneficial use of its aquifers, groundwater and/or surface water for serving water to its customers.

259.    As a direct and proximate result of the acts and omissions of Defendants,  the Lakewood Township Municipal Utilities Authority has had to remove some of its wells from service, expend significant sums to investigate the source and extent of the contamination, and/or expend significant sums to plan for treatment of its water to make it safe.

260.    As a direct and proximate result of the acts and omissions of Defendant, the Lakewood Township Municipal Utilities Authority has incurred and will incur additional costs for the construction of a water treatment facilities capable of removing PFOS and PFOA from its water supply, additional costs in the future for the operation and maintenance of that water treatment facilities and additional costs complying with federal and state regulations arising from PFAS, including PFOS and PFOA, contamination of Plaintiff's aquifers, groundwater and surface water sources and/or drinking water.

261.    Defendants' distribution of their defective products, despite their knowledge of the defects, including the increased risks of widespread contamination of the groundwater, surface water, and drinking water supplies with toxic and carcinogenic chemicals and the risks to the unsuspecting residents in surrounding areas was so reckless or wanting in care that it constituted a conscious disregard and/or indifference to the life, safety, or rights of the Plaintiff and the residents and businesses who rely on the drinking water that Plaintiff provides.

262.    Defendants' conduct was so reckless or wanting in care that it constituted intentional misconduct.

## SIXTH COUNT

### Public Nuisance

263.    Plaintiff hereby incorporates by reference the allegations set forth in the previous paragraphs of this Complaint as if they were set forth at length herein.

264.    Through Defendants' acts and omissions, Defendants' PFAS and PFAS-containing products have directly and proximately caused environmental contamination that has unreasonably interfered with, and continues to interfere with, Plaintiff's right to a clean environment, which right Plaintiff holds in common with members of the public, and which right is specifically permitted.

265.    Through Defendants' acts and omissions, Defendants' PFAS and PFAS-containing products have directly and proximately caused environmental contamination that has unreasonably interfered with, and continues to interfere with, Plaintiff's right to the use of aquifers, groundwater and surface waters as a source of potable water, which right Plaintiff holds in common with members of the public, and which right is specifically permitted.

266.    The public nuisance created by Defendants is continuing.

267.    Defendants have failed, and continue to fail, to abate the public nuisance.

268.    As a result of the public nuisance, Plaintiff has suffered and continues to suffer, significant harm and damages special to Plaintiff and different in kind from those the general public may have suffered, including investigation, cleanup, remediation, and removal costs and damages related to the detection, treatment and removal of PFAS constituents that have and will continue to migrate into Plaintiff's wells, such that Defendants should be required by injunction to abate the nuisances they have created.

## SEVENTH COUNT

### Trespass

269.    Plaintiff incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if they were set forth at length herein.

270.    Defendants' wrongful acts and omissions have resulted and/or continue to result in the unlawful release and/or threatened release of PFAS under, onto and/or into Plaintiff's public drinking water supply(ies).

271.    The presence of the PFAS in Plaintiff's public drinking water supply(ies) was and continues to be without Plaintiff's permission.

272.    The presence of PFAS in Plaintiff's public drinking water supply(ies) constitutes a continuing trespass.

273.    Defendants' past and continuing trespass upon Plaintiff's public drinking water supply(ies) has proximately caused and/or continues to proximately cause damage to Plaintiff.

274.    As a direct and proximate result of the acts and omissions of Defendants, the Lakewood Township Municipal Utilities Authority has had to remove some of its wells from service, expend significant sums to investigate the source and extent of the contamination, and/or expend significant sums to plan for treatment of its water to make it safe.

275.    As a direct and proximate result of the acts and omissions of Defendant, the Lakewood Township Municipal Utilities Authority has incurred and will incur additional costs for the construction of a water treatment facilities capable of removing PFOS and PFOA from its water supply, additional costs in the future for the operation and maintenance of that water treatment facilities and additional costs complying with federal and state regulations arising from PFAS,

including PFOS and PFOA, contamination of Plaintiff's aquifers, groundwater and surface water sources and/or drinking water.

276.    Defendants' distribution of their defective products, despite their knowledge of the defects, including the increased risks of widespread contamination of the groundwater, surface water, and drinking water supplies with toxic and carcinogenic chemicals and the risks to the unsuspecting residents in surrounding areas was so reckless or wanting in care that it constituted a conscious disregard and/or indifference to the life, safety, or rights of the Plaintiff and the residents and businesses who rely on the drinking water that Plaintiff provides.


## EIGHTH COUNT

### Violation of New Jersey's Uniform Fraudulent Transfer Act
### (E.I. du Pont de Nemours and Company, The Chemours Company, The Chemours Company FC, LLC, Corteva, Inc., and DuPont de Nemours, Inc.)

277.    Plaintiff hereby incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if they were set forth at length herein.

278.    Plaintiff seeks equitable and other relief pursuant to the New Jersey Uniform Fraudulent Transfer Act ("FUFTA"), N.J.S.A. 25:2-20 et seq., against E.I. du Pont de Nemours and Company, The Chemours Company, The Chemours Company FC, LLC, Corteva, Inc., and DuPont de Nemours, Inc. (collectively the "FUFTA Defendants").

279.    Under the FUFTA, "[a] transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation: (i) with actual intent to hinder, delay, or defraud any creditor of the debtor; or (ii) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor: (a) was

engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (b) intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due." N.J.S.A. 25:2-25.

280.    The FUFTA Defendants have (a) acted with actual intent to hinder, delay and defraud parties, and/or (b) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and (i) were engaged or were about to engage in a business for which the remaining assets of The Chemours Company were unreasonably small in relation to the business; or (ii) intended to incur, or believed or reasonably should have believed that The Chemours Company would incur, debts beyond its ability to pay as they became due.

281.    The FUFTA Defendants engaged in acts in furtherance of a scheme to transfer E. I. du Pont de Nemours and Company's assets out of the reach of parties such as Plaintiff that have been damaged as a result of the FUFTA Defendants' conduct, omissions, and actions described in this Complaint.

282.    It is primarily E. I. du Pont de Nemours and Company, rather than The Chemours Company, that for decades manufactured, marketed, distributed and/or sold AFFF containing PFAS and PFAS surfactant for use in AFFF with the superior knowledge that they were toxic, mobile, persistent, bioaccumulative, and biomagnifying, and through normal and foreseen use, would contaminate the Plaintiffs drinking water supply and injure the Plaintiff.

283.    As a result of the transfer of assets and liabilities described in this Complaint, the FUFTA Defendants have attempted to limit the availability of assets to cover judgments for all of the liability for damages and injuries from the manufacturing, marketing, distribution and/or sale of AFFF containing PFAS and PFAS surfactants for use in AFFF.

284.    At the time of the transfer of its Performance Chemicals Business to The Chemours Company, E. I. du Pont de Nemours and Company had been sued, threatened with suit and/or had knowledge of the likelihood of litigation to be filed regarding DuPont's liability for damages and injuries from the manufacturing, marketing, distribution and/or sale of AFFF containing PFAS and/or PFAS compounds for use in AFFF.

285.    The FUFTA Defendants acted without receiving a reasonably equivalent value in exchange for the transfer or obligation, and E. I. du Pont de Nemours and Company believed or reasonably should have believed that The Chemours Company would incur debts beyond The Chemours Company's ability to pay as they became due.

286.    At all times relevant to this action, the claims, judgment and potential judgments against The Chemours Company potentially exceed The Chemours Company's ability to pay.

287.    Pursuant to New Jersey's FUFTA, Plaintiff seeks avoidance of the transfer of E. I. du Pont de Nemours and Company's liabilities for the claims brought in this Complaint and to the FUFTA Defendants liable for any damages or other remedies that may be awarded by the Court or jury under this Complaint.

288.    Plaintiff further seeks all other rights and remedies that may be available to it under FUFTA, including prejudgment remedies as available under applicable law, as may be necessary to fully compensate Plaintiff for the damages and injuries she has suffered as alleged in this Complaint.

## TOLLING OF THE STATUTE OF LIMITATIONS

### DISCOVERY RULE

289.    Plaintiff hereby incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if they were set forth at length herein.

290.    Plaintiff had no way of knowing about the risk of serious injury associated with the use of and exposure to AFFF and/or PFAS until very recently.

291.    Within the time period of any applicable statute of limitations, Plaintiff could not have discovered, through the exercise of reasonable diligence, that exposure to AFFF and/or PFAS is harmful to human health.

292.    Plaintiff did not discover and did not know of facts that would cause a reasonable person to suspect the risk associated with the use of and exposure to AFFF and/or PFAS; nor would a reasonable and diligent investigation by Plaintiff have disclosed that AFFF could cause personal injury.

293.    For these reasons, all applicable statutes of limitations have been tolled by operation of the discovery rule with respect to Plaintiff's claims.


## FRAUDULENT CONCEALMENT TOLLING

294.    Plaintiff hereby incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if they were set forth at length herein.

295.    All applicable statute of limitations have also been tolled by Defendants knowing and active fraudulent concealment and denial of the facts alleged herein throughout the time period relevant to this action.

296.    Instead of disclosing critical safety information regarding AFFF and/or PFAS, Defendants have consistently and falsely represented the safety of AFFF products.

297.    This fraudulent concealment continues through present day.

298.    Due to this fraudulent concealment, all applicable statutes of limitations have been tolled by operation of the discovery rule with respect to Plaintiffs' claims.

## ESTOPPEL

299.    Plaintiff hereby incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if they were set forth at length herein.

300.    Defendants were under a continuous duty to consumers, end users, and other persons coming into contact with their products, including Plaintiff, to accurately provide safety information concerning its products and the risk associated with the use of and exposure to AFFF and/or PFAS.

301.    Instead, Defendants knowingly, affirmatively, and actively concealed safety information concerning AFFF and/or PFAS and the serious risks associated with the use of and exposure to AFFF and/or PFAS.

302.    Based on the foregoing, Defendants are estopped from relying on any statute of limitations in defense of this action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, the Lakewood Township Municipal Utilities Authority, respectfully requests that this Court:

a.      Enter judgment and finding Defendants jointly and severally liable for all compensatory, statutory damages and/or any other damages available in law or equity, including, but not limited to, for all costs and damages incurred by Plaintiff, including but not limited to prior, interim and future capital as well as operation and maintenance costs related to PFAS contamination; including the reasonable costs of sampling, investigations, and assessment of injury, and destruction or loss resulting from PFAS contamination;

b.      Enter judgment finding Defendants liable for punitive damages;

c.      Enter judgment finding Defendants liable for consequential damages;

d.      Enter judgment requiring, via injunction, Defendants to abate the nuisance and trespass they have created;

e.      Enter judgment voiding any transfers pursuant to New Jersey's FUFTA to the extent necessary to satisfy Plaintiff's claims;

f.      Enter judgment pursuant to New Jersey's FUFTA enjoining any entity from distributing, transferring, capitalizing or otherwise transferring any proceeds from the sale of any business lines, segments, divisions or other assets that formerly belonged to E. I. du Pont de Nemours and Company or any related or successor entity;

g.      Award Plaintiff, the Lakewood Township Municipal Utilities Authority costs and expenses and reasonable attorney fees incurred in prosecuting this action, together with prejudgment interest, to the full extent permitted by law; and

h.      Award Plaintiff, the Lakewood Township Municipal Utilities Authority, any other remedy or relief available in law or equity or as this Court deems appropriate.

**<u>JURY TRIAL DEMANDED</u>**

Plaintiff, the Lakewood Township Municipal Utilities Authority, demands a trial by jury as to all issues and defenses.

Respectfully Submitted,

**Wilentz, Goldman & Spitzer P.A.**

_/s/ Stephen T. Sullivan, Jr._
Stephen T. Sullivan, Jr.
John E. Keefe, Jr.
**Wilentz, Goldman & Spitzer P.A.**
125 Half Mile Road, Suite 100
Red Bank, NJ 07701
Telephone: 732-855-6060
Facsimile: 732-726-4860

Dated: January 18, 2023